UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ABRAHAM G. BREIER, JOSHUA LIEBERMAN, and CONG. KHAL CHASIDIM,
Petitioners,

-against-

CONG. CASA GRANDE and YEHOSHIA RUBIN,
Respondents.
---------------------------------------------------------------X

No. 25-CV-9941 (VSB) (VF)

**OPINION & ORDER**

**VALERIE FIGUEREDO, United States Magistrate Judge**:

Presently before the Court is a motion to compel arbitration filed by Petitioners Abraham Breier, Joshua Lieberman, and Congregation Khal Chasidim (collectively, "Petitioners"). ECF No. 2. Respondents Congregation Casa Grande and Yehoshia Rubin (collectively, "Respondents") oppose the motion. ECF No. 16. For the reasons stated herein, the motion to compel arbitration is **GRANTED**.

## BACKGROUND[1]

In 2020, Respondent Rubin moved to Casa Grande, Arizona, to establish a Hasidic Jewish community. ECF No. 2-3 at 5.[2] Rubin purchased a building in Casa Grande, and Respondent Congregation Casa Grande opened the Khal Chasidim of Casa Grande synagogue on the property. Id. Rubin serves as a director of Congregation Casa Grande. Id. at 3 n.1. In 2022, Rubin formed two nonprofit corporations: "Congregation Khal Chasidim" and "Congregation Khal Chasidim CG." Id. at 6.

In 2023, Petitioners Breier and Lieberman opened a competing synagogue in the Casa Grande Hasidic community, called Congregation Khal Chasidim. Id. at 7-8; ECF No. 2 at 8. Lieberman is the secretary of Petitioner Congregation Khal Chasidim and Breier, who lives in New York, is active in the synagogue. ECF No. 2 at 8. After Congregation Khal Chasidim began receiving funds that Respondents believe were intended for Congregation Casa Grande, Rubin accused Breier and Lieberman of "taking [funds] people donated" to Congregation Casa Grande and demanded that Petitioners return "any money intended" for Congregation Casa Grande. ECF No. 2-3 at 10-14. In August 2025, Congregation Casa Grande filed suit in federal court in

---

[1] The facts herein are drawn from Petitioners' motion to compel arbitration and supporting attachments, ECF No. 2 (including Respondents' complaint against Petitioners in the United States District Court for the District of Arizona, ECF No. 2-3), Respondents' opposition and supporting attachments, ECF No. 16, and Petitioners' reply, ECF No. 21. When evaluating a motion to compel arbitration, courts "apply a standard similar to that applicable for a motion for summary judgment." Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017) (quoting Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)). Accordingly, "'the court consider[s] all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits,' Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002), and draws all reasonable inferences in favor of the non-moving party." Id. (citing Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016)).

[2] The page numbers referenced herein for citations to the electronic docket ("ECF") are to the electronically generated pagination in those documents.

Arizona (the "Arizona Lawsuit"), alleging that Breier and Lieberman established Congregation Khal Chasidim to deceive donors and draw donations away from Congregation Casa Grande to their synagogue.[3] Id. at 8-14.

Petitioners allege that before Congregation Casa Grande brought the Arizona Lawsuit, the parties had agreed to arbitrate the dispute concerning Congregation Khal Chasidim's alleged receipt of funds intended for Congregation Casa Grande before a *beth din*, a Jewish rabbinical tribunal.[4] ECF No. 2 at 10-12. On April 23, 2025, Respondents sent Breier and Lieberman summonses via e-mail, inviting them to arbitrate the dispute before Shaarei Mishpot, a *beth din* in Israel. ECF No. 2-2 at 4; ECF No. 2-5 at 4; ECF No. 16 at 6 ("Respondents initiated the traditional Beth Din process by sending Petitioners a hazmana, a summons to appear before a rabbinical court in Israel."). The summonses specified the issues to be arbitrated: (1) the alleged theft of the Respondents' synagogue name, (2) the alleged theft of charitable funds, and (3) defamation. ECF No. 2-2 at 4; ECF No. 2-5 at 4. Rubin was acting in his capacity as a director of Congregation Casa Grande when he issued the summonses. ECF No. 2 at 10 n.3; ECF No. 2-2 at 4; ECF No. 2-3 at 5.

On April 28, 2025, Breier responded to the summons by e-mail, proposing an alternate forum, Mishpetei Tzedek of Square in Rockland County, New York, writing, "I choose to go litigate before the Rabbinical Court 'Mishpetei Tzedek' of Square[.]" ECF No. 2-2 at 3. On April

---

[3] The lawsuit in Arizona is Cong. Casa Grande v. Breier, No. 25-CV-2788 (D. Ariz. filed Aug. 5, 2025).

[4] A *beth din* is "a rabbinical tribunal having authority to advise and pass upon matters of traditional Jewish law." Avitzur v. Avitzur, 58 N.Y.2d 108, 112 (1983). "Some Jewish communities either prefer to—or believe themselves religiously bound to—resolve disputes between members by referring matters to arbitration before a *beth din* rather than exposing them in secular courts." Fantastic Indus., Inc. v. Kryman, No. 20-CV-2402 (ERK) (PER), 2021 WL 2809979, at *1 n.2 (E.D.N.Y. July 6, 2021).

29, 2025, with Breier copied on the e-mail, Respondents' rabbinical counsel[5] sent an e-mail to Mishpetei Tzedek requesting dates to proceed "since [Breier] has chosen to litigate before your Rabbinical Court[.]" ECF No. 2-2 at 6. With Breier still copied, Respondents' rabbinical counsel and Mishpetei Tzedek's secretary exchanged additional e-mails about scheduling and when Respondents could appear before the *beth din*. ECF No. 2-2 at 5-6. After Respondents' rabbinical counsel and Mishpetei Tzedek's secretary were unable to agree on dates, they tried to coordinate the selection of the arbitrators for the *beth din* panel. ECF No. 16 at 10; ECF No. 16-4 at 3-4. Ultimately, Respondents' rabbinical counsel and Mishpetei Tzedek's secretary failed to reach agreement on both the selection of arbitrators and a specific date for a proceeding. ECF No. 2-1 ¶ 12; ECF No. 16 at 9-11.

On April 28, 2025, Lieberman also responded to the summons by proposing an alternative forum, stating, "I choose to go litigate before the Rabbinical Court Mishpetei Tzedek of Square." ECF No. 2-5 at 3. On April 29, 2025, Respondents' rabbinical counsel asked Lieberman to "propose a list of three Rabbinical courts as is customary." ECF No. 2-5 at 11. After Lieberman did not respond to this request, Respondents issued a second summons on May 14, 2025, and demanded that Lieberman propose three *beth din* forums. ECF No. 2-5 at 8; ECF No. 2 at 12; ECF No. 16 at 12. The second summons also included an additional claim for copyright infringement. ECF No. 2-5 at 8. On May 20, 2025, Lieberman's rabbinical counsel responded with a list of three *beth dins*: (1) Mishpetei Tzedek; (2) Machon LeHora'ah in Rockland County, New York; and (3) Rabbinical Court Tzedek U'Mishpat in Brooklyn, New York. ECF No. 2-5 at 10; ECF No. 2 at 12. Respondents' rabbinical counsel rejected

---

[5] In the e-mail communications between the parties concerning arbitration before a *beth din*, Yosef Meier Weitzburg represented himself as a "Rabbinical Advocate" acting on behalf of Rubin. ECF No. 2-2 at 6; ECF No. 2-5 at 5.

Lieberman's proposed forums and "sought permission to pursue this dispute in civil court." ECF No. 16 at 13; ECF No. 2 at 12.

Congregation Casa Grande commenced the Arizona Lawsuit on August 5, 2025, in the United States District Court for the District of Arizona (see ECF No. 2 at 11), alleging violations of the Lanham Act for false designation of origin and false advertising, 15 U.S.C. § 1125(a)(1)(A)-(B), and state law claims for unlawful acts or practices, tortious interference, unfair competition, conversion and civil theft, civil conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duties, and unjust enrichment. ECF No. 2-3 at 14-34. On December 1, 2025, Petitioners filed the instant motion to compel arbitration. ECF No. 2. Respondents filed their memorandum of law in opposition on May 12, 2026 (ECF No. 16), and Petitioners filed their reply on June 2, 2026 (ECF No. 21).

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs when a court shall compel arbitration and stay all proceedings before it:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Federal Arbitration Act, 9 U.S.C. § 3.

Under the FAA, a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution." Ross v. Am. Express Co., 547 F.3d 137, 142 (2d Cir. 2008) (internal

quotation marks and citations omitted); see also Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91 (2000) (noting the "liberal federal policy favoring arbitration agreements") (citation omitted).

To determine whether to compel arbitration, courts perform a two-step inquiry that looks at contract principles "governed by state rather than federal law." Cap Gemini Ernst & Young, U.S., LLC v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003) (per curiam). At step one, the court considers "whether 'the parties enter[ed] into a contractually valid arbitration agreement.'" Gordon v. Wilson Elser Moskowitz Edelman & Dicker LLP, No. 22-CV-5212 (JPC) (JW), 2023 WL 2138693, at *2 (S.D.N.Y. Feb. 21, 2023) (quoting Cap Gemini Ernst & Young, 346 F.3d at 365) (alteration in original)). At step two, the court asks, "whether a court or an arbitrator should decide if the dispute falls within the scope of the agreement to arbitrate." Citigroup Inc. v. Sayeg, No. 21-CV-10413 (JPC), 2022 WL 179203, at *5 (S.D.N.Y. Jan. 20, 2022) (internal quotation marks and citations omitted). "[I]f the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." Gordon, 2023 WL 2138693, at *2 (quoting Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 69 (2019)) (alteration in original, internal quotation marks omitted). If it does not, then the court considers whether "the parties' dispute fall[s] within the scope of the arbitration agreement[.]" Cap Gemini Ernst & Young, 346 F.3d at 365.

"Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986). To show "clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator," parties may point to provisions of an arbitration agreement "explicitly incorporat[ing] procedural rules that empower

an arbitrator to decide issues of arbitrability." DDK Hotels, LLC v. Williams-Sonoma, Inc., 6 F.4th 308, 318 (2d Cir. 2021) (internal quotation marks and citations omitted).

After the two-step inquiry, the Court examines whether "one party to the agreement has failed, neglected or refused to arbitrate." Beijing Shougang Mining Inv. Co. v. Mongolia, 11 F.4th 144, 162 (2d Cir. 2021) (internal quotation marks and citations omitted). "A party has refused to arbitrate if it commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so." Id. (cleaned up).

"In determining whether to compel arbitration, the Court applies a standard similar to that used at summary judgment and must construe all reasonable inferences in favor of [ ] the non-moving party." Palmer v. Starbucks Corp., 735 F. Supp. 3d 407, 415 (S.D.N.Y. 2024); see also Barrows v. Brinker Rest. Corp., 36 F.4th 45, 49 (2d Cir. 2022) ("Because motions to compel arbitration are governed by a standard similar to that applicable for a motion for summary judgment, a court must draw all reasonable inferences in favor of the non-moving party.") (internal quotation marks and citations omitted). It is the burden of the party resisting arbitration to "prov[e] that the claims at issue are unsuitable for arbitration." Green Tree Fin. Corp., 531 U.S. at 91. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" Moses H. Cone Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). "If the parties have in fact agreed to arbitrate, the district court must then stay proceedings." Montanus v. Columbia Mgmt. Inv. Advisers, LLC, No. 25-CV-2798 (PAE), 2025 WL 2503326, at *8 (S.D.N.Y. Sept. 2, 2025).

## DISCUSSION

The sole dispute here is whether there is an enforceable agreement between the parties that allows Petitioners to compel Respondents to arbitrate the claims raised in the Arizona

Lawsuit. Petitioners contend that Respondents formed binding agreements with Breier and Lieberman to arbitrate the claims before a *beth din*, and that equitable estoppel permits Congregation Khal Chasidim to also compel arbitration. ECF No. 2 at 5-6, 19. In response, Respondents assert that no arbitration agreement exists between any of the parties. ECF No. 16 at 16. For the reasons explained below, Petitioners may compel Respondents to arbitrate.

**A. Breier May Compel Arbitration.**

Breier moves to compel arbitration based on the April 23, 2025 summons to arbitrate before a *beth din* and the parties' subsequent communications. Under the FAA, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Techs., 475 U.S. at 648 (internal quotation marks and citations omitted). When determining whether parties agreed to submit to arbitration, "a district court must 'apply ordinary state-law principles that govern the formation of contracts.'" Siegel v. Milstein, No. 21-CV-4032 (JS) (SIL), 2021 WL 5052748, at *2 (E.D.N.Y. Nov. 1, 2021) (citing Medrite Care, LLC v. Medrite 243 LLC, No. 20-CV-3456 (MKV), 2020 WL 3962010, at *2 (S.D.N.Y. July 13, 2020)).

To form a contract under New York law, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 93 N.Y.2d 584, 589 (1999). This requires determining whether there is a "sufficiently definite offer such that its unequivocal acceptance will give rise to an enforceable contract." Kolchins v. Evolution Markets, Inc., 31 N.Y.3d 100, 106 (2018) (quoting Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp., 41 N.Y.2d 397, 399 (1977)). A purported acceptance that modifies the terms of the offer "is equivalent to a rejection and counteroffer." Medrite, 2020 WL 3962010, at *2 (quoting Robison v. Sweeney, 301 A.D.2d 815, 818-19 (3d Dep't 2003)).

The April 23 summons to Breier was an offer to arbitrate. See Siegel, 2021 WL 5052748, at *3 (finding that a summons issued by plaintiff to arbitrate before a *beth din* constituted an offer to arbitrate under New York law) (citing King v. King, 208 A.D.2d 1143, 1143-44 (3d Dep't 1994)); Medrite, 2020 WL 3962010, at *1-2, *4. Like the summons that qualified as an offer in Siegel, the summons to Breier is sufficiently definite. It specifies the disputes at issue—"theft of private funds, and the business name [Khal Chasidim], and defamation," ECF No. 2-2 at 4—and states that the parties will appear before a specific forum, the *beth din* of Shaarei Mishpot, Israel, if Breier agrees. Id. ("It is upon [Breier] to immediately notify the Rabbinical court whether he will appear at the stated time."); see Siegel, 2021 WL 5052748, at *3.

Instead of accepting the offer and agreeing to arbitrate in Israel, Breier responded on April 28 by proposing Mishpetei Tzedek as an alternate *beth din* forum. ECF No. 2-2 at 3 ("I choose to go litigate before the Rabbinical Court 'Mishpetei Tzedek' of Square[.]"). Breier's response to Respondents' initial summons modified the material terms of the offer to arbitrate by proposing an alternative forum, constituting a rejection and counteroffer. See Medrite, 2020 WL 3962010, at *2 (finding that proposing an alternative *beth din* forum constituted a rejection and counteroffer) (citing Robison, 301 A.D.2d at 818-19); Siegel, 2021 WL 5052748, at *3 ("Defendants changed or qualified the terms of Plaintiff's offer to arbitrate" by offering to proceed before a different *beth din*, "which constitutes a rejection and counteroffer pursuant to New York law.")

In determining whether Respondents' course of conduct and communications created a legally enforceable agreement, New York law looks to "the objective manifestations of the intent of parties as gathered by their expressed words and deeds." Brown Bros., 41 N.Y.2d at 399; see also Kolchins, 31 N.Y.3d at 106. An exchange of e-mails may constitute an enforceable

agreement if the writings include the agreement's essential terms, Sullivan v. Ruvoldt, No. 16-CV-583 (ER), 2017 WL 1157150, at *6 (S.D.N.Y. Mar. 27, 2017), and the forum selected by the parties is an essential term of an arbitration agreement. Augustea Impb Et Salvataggi v. Mitsubishi Corp., 126 F.3d 95, 99 (2d Cir. 1997); Warnes, S.A. v. Harvic Int'l, Ltd., No. 92-CV-5515 (RWS), 1993 WL 228028, at *2 (S.D.N.Y. June 22, 1993) ("[A]n agreement to arbitrate before a particular forum is as integral a term of a contract as any and must be enforced as such."). Following Breier's counteroffer, Respondents' rabbinical counsel sent an e-mail to Mishpetei Tzedek on April 29 stating that Breier "has chosen to litigate in your court" and counsel requested dates to appear before that forum. ECF No. 2-2 at 6 ("[S]ince [Breier] has chosen to litigate before your Rabbinical Court, please propose dates."). The response from Respondents' rabbinical counsel constituted an acceptance of Breier's counteroffer.[6] See Ruggerio v. Dynamic Elec. Sys. Inc., No. 12-CV-100 (LG), 2012 WL 3043102, at *10 (E.D.N.Y. July 25, 2012) ("Under New York law, a counteroffer may be accepted by conduct.") (citation omitted) (collecting cases). That response to Breier by Respondents' rabbinical counsel

[6] Courts in this Circuit have found statements by a party's rabbinical counsel concerning an arbitration agreement to be binding on that party. See Rechnitz v. Kutner, No. 20-CV-1607 (KAM) (VMS), 2020 WL 3051498, at *2-3, *11 (E.D.N.Y. June 8, 2020); Magid v. Waldman, No. 19-CV-11516 (JMF), 2020 WL 4891218, at *1 (S.D.N.Y. Aug. 19, 2020). Under traditional principles of agency law, an agent (Respondents' rabbinical counsel) can bind a principal (Respondents) to an arbitration agreement if "the agent has authority to act on the principal's behalf with respect to that agreement." Perry St. Software, Inc. v. Jedi Techs., Inc., No. 20-CV-04539 (CM), 2020 WL 6064158, at *5 (S.D.N.Y. Oct. 14, 2020) (citing In re Arb. Between Nat'l Union Fire Ins. Co. of Pittsburgh v. Pers. Plus, Inc., 954 F. Supp. 2d 239, 245 (S.D.N.Y. 2013)) (emphasis omitted). Respondents' rabbinical counsel "clearly had actual authority to bind [Respondents] to arbitrate" because he acted on behalf of Respondents in arbitration discussions with Breier and Lieberman. Telenor Mobile Commc'ns AS v. Storm LLC, 524 F. Supp. 2d 332, 354 (S.D.N.Y. 2007); Buffalo Xerographix, Inc. v. Hartford Ins. Grp., 540 F. Supp. 382, 392 (W.D.N.Y. 2021) ("Agency principles establish that a principal will be bound under an agreement entered into by its agent on its behalf when the principal authorizes the agent to enter the agreement on its behalf.").

"evidence[d] the intent that" the *beth din* forum was conclusively agreed upon, which was the essential term of the agreement to arbitrate. Hostcentric Techs., Inc. v. Republic Thunderbolt, LLC, No. 04-CV-1621 (KMW) (AJP), 2005 WL 1377853, at *7 (S.D.N.Y. June 9, 2005); see also Wall St. Assocs., L.P. v. Becker Paribas Inc., 27 F.3d 845, 850 (2d Cir.1994) ("Just as consent to arbitration itself may itself be implied from a party's conduct, so also can consent to a particular arbitration forum be inferred from a party's actions.") (internal citation omitted).

Indeed, after receiving a list of dates from Mishpetei Tzedek's secretary, Respondents' rabbinical counsel wrote that the proposed May 6, 2025 date was "acceptable on our side if it is possible to begin the hearing in the morning." ECF No. 2-2 at 5. Respondents' rabbinical counsel also requested additional dates for Rubin to appear before the forum and discussed the selection of arbitrators. Id. ("Please propose additional dates . . . so that [Rubin] can attend a consecutive two-day hearing."); ECF No. 16 at 24. Breier was copied on every e-mail between Respondents' rabbinical counsel and Mishpetei Tzedek. ECF No. 2-2 at 5-6; ECF No. 16-3 at 3-4; ECF No. 16-4 at 3-4. Taken together, the statements by Respondents' rabbinical counsel to Breier show an objective intent by Rubin, representing Congregation Casa Grande, to arbitrate before a *beth din*. Respondents thus accepted Breier's counteroffer to arbitrate and selected the forum—Mishpetei Tzedek.[7] See Hostcentric Techs., 2005 WL 1377853, at *7 ("The . . . emails constitute a classic

---

[7] The FAA requires a written agreement to arbitrate, 9 U.S.C. § 4, and the e-mails between Breier and Respondents are sufficient for that purpose. See Sunskar Ltd. v. CDII Trading, Inc., 828 F. Supp. 2d 604, 617-18 (S.D.N.Y. 2011) (finding that "[w]ritten communications via Skype provide unambiguous evidence of the parties' meeting of the minds over . . . the agreement to arbitrate"); Schnabel v. Trilegiant Corp., 697 F.3d 110, 123 n.14 (2d Cir. 2012) (citing Campbell v. Gen. Dynamics Gov't Sys., 407 F.3d 546, 555 (1st Cir. 2005)) ("[A]n email, properly couched, can be an appropriate medium for forming an arbitration agreement."); see also Meltzer, Lippe, Goldstein & Breitstone, LLP v. Malfetti, No. 16-CV-1637 (DRH) (ARL), 2018 WL 4627667, at *9 (E.D.N.Y. Sep. 27, 2018) ("[I]t is well established in New York that an email exchange may create an enforceable contract.").

offer and acceptance, contain all the terms of the agreement, and evidence the intent that the matter was now conclusively settled.") (internal quotation marks omitted); Scheinmann v. Dykstra, No. 16-CV-5446 (AJP), 2017 WL 1422972, at *3 (S.D.N.Y. Apr. 21, 2017).

Respondents contend that they rejected Breier's counteroffer. ECF No. 16 at 22. But an analysis of cases involving negotiations to arbitrate before a *beth din* indicate otherwise. In Medrite, the court found that the parties' agreement to arbitrate before a *beth din* was unenforceable because they did not agree on which forum would hear the dispute. Medrite, 2020 WL 3962010, at *4. The Medrite defendants responded to an initial summons to appear before a particular *beth din* by counter-serving a summons to appear before a different *beth din*. Id. at 1-2. Likewise, in Siegel, the plaintiff sent initial summonses to arbitrate before the *beth din* of a particular rabbinical court. Siegel, 2021 WL 5052748, at *3. The defendant responded by offering to proceed before two alternative *beth din* forums, which the plaintiff "promptly rejected." Id. Here, by contrast, when Breier sent an alternative *beth din* forum, Respondents did not reject the forum and instead affirmed their intention to arbitrate in that forum by asking for proposed dates for the arbitration and discussing the selection of arbitrators.

In short, the communications between Breier and Respondents' rabbinical counsel formed an enforceable arbitration agreement because they objectively manifested "an agreement as to the material term of which [*beth din* forum] would arbitrate their dispute." Id. (citing Medrite, 2020 WL 3962010, at *4).

**B. Lieberman May Compel Arbitration.**

As it concerns Lieberman, however, the communications do not demonstrate an agreement to arbitrate. But Lieberman may nonetheless compel Respondents to arbitrate the claims against him under the doctrine of equitable estoppel.

1. *There is no arbitration agreement between Lieberman and Respondents.*

As occurred with Breier, Respondents' rabbinical counsel sent Lieberman a summons to arbitrate before a *beth din* in Israel. ECF No 2-5 at 4. In response to the April 23 summons, Lieberman replied that he was "choos[ing] to litigate before . . . Mishpetei Tzedek." Id. at 3. Lieberman thus rejected Respondents' offer to arbitrate and instead made a counteroffer that proposed an alternative *beth din* forum. See Medrite, 2020 WL 3962010, at *2 (citing Robison, 301 A.D.2d at 818-19); Siegel, 2021 WL 5052748, at *3. And in contrast to the forum-related communications with Breier, Respondents' rabbinical counsel did not respond to Lieberman by asking for dates for the arbitration or discussing arbitrators. Instead, after Lieberman proposed the Mishpetei Tzedek *beth din*, Respondents issued a second summons for the *beth din* in Israel and requested that Lieberman propose additional forums. ECF No. 2-5 at 5, 8. In other words, Respondents rejected Lieberman's counteroffer. Whereas Respondents' communications following Breier's counteroffer manifested an agreement to proceed before a specific *beth din*, the communications following Lieberman's counteroffer indicate no such intent. See Siegel, 2021 WL 5052748, at *4 (finding "competent evidence demonstrat[ing] that the parties' colloquy fell short of an agreement to arbitrate because they did not reach an agreement as to the material term of which [*beth din*] would arbitrate their dispute").

There thus was no manifestation by both sides of an intent to arbitrate, and absent a written agreement to arbitrate, the FAA is inapplicable. See Soliman v. Subway Franchisee Advert. Fund Tr., Ltd., 999 F.3d 828, 834 (2d Cir. 2021) ("[Courts] will not enforce arbitration [under the FAA] unless and until it is determined that an agreement exists.") (citing Meyer, 868 F.3d at 73).

2. *Lieberman may compel arbitration under the doctrine of equitable estoppel.*

In the alternative, Petitioners are correct that Lieberman may compel arbitration under the doctrine of equitable estoppel. "Generally, federal law 'does not require parties to arbitrate when they have not agreed to do so[.]'" Awad v. Extended Nursing Pers., No. 24-CV-2117 (MKV), 2025 WL 753865, at *6 (S.D.N.Y. Mar. 10, 2025) (alterations in original) (citing Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 19 (2d Cir. 1995)). Nevertheless, a party to an enforceable arbitration agreement—like the one between Breier and Respondents—"may be required to arbitrate a dispute" with a non-party (in this case, Lieberman) when, as is relevant here, "(a) the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed and (b) there is a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." Awad, 2025 WL 753865, at *6 (internal quotation marks and citations omitted).

Here, Lieberman seeks to arbitrate the same issues as Breier. Both of them brought the instant motion to compel arbitration of the claims raised by Respondents in the Arizona Lawsuit. ECF No. 2 at 7-9 ("These [arbitration] agreements encompass all claims asserted in the Arizona Lawsuit"); see generally ECF No. 2-3. The issues Lieberman seeks to arbitrate are thus sufficiently intertwined with the agreement between Respondents and Breier, because Respondents "make the same factual allegations against [Lieberman] as they do against [Breier]." Salzano v. Lace Enter. Inc., No. 13-CV-5600 (LGS), 2014 WL 3583195, at *5 (S.D.N.Y. July 18, 2014) (citing Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 128 (2d Cir. 2010)); see also Cooper v. Ruane Cunniff & Goldfarb Inc., 990 F.3d 173, 189 (2d Cir. 2021)

(Sullivan, J., dissenting) ("Issues are 'intertwined' with an arbitration agreement . . . when those issues are 'factually intertwined' with a dispute between the original parties to the agreement.") (citing Ragone, 595 F.3d at 127-28). Moreover, it was Respondents who issued the summonses to arbitrate to Lieberman and Breier, and the summonses identified the same dispute between the parties.[8] ECF No. 2-2 at 4; ECF No. 2-5 at 4, 8. The fact that Respondents have "the same dispute" with a party to the arbitration agreement (Breier) and a non-party (Lieberman) "makes clear that [their] claims are sufficiently 'intertwined' with that agreement." Cooper, 990 F.3d at 189 (Sullivan, J., dissenting); see also Awad, 2025 WL 753865, at *8; In re A2P Antitrust Litig., 972 F. Supp. 2d 465, 478 (S.D.N.Y. 2013).

Lieberman also has a sufficiently close relationship with the parties to justify estopping Respondents from denying an obligation to arbitrate with him. In that regard, Respondents have treated Breier and Lieberman as a "single unit," which the Second Circuit "has found weighs in favor of applying equitable estoppel." Cooper, 990 F.3d at 190 (Sullivan, J., dissenting) (citing JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 177 (2d Cir. 2004); Denney v. BDO Seidman, LLP, 412 F.3d 58, 70 (2d Cir. 2005)). In their initial summonses, as well as in their allegations in the Arizona Lawsuit, Respondents contend that Breier and Lieberman acted together. ECF No. 2-2 at 4; ECF No. 2-3 at 2-3; ECF No. 2-5 at 4. Both summonses contained identical claims against Breier and Lieberman (theft of private funds, theft of business name, and defamation) and included the same description of Respondents' claim: "the defendant is making use of [Congregation Casa Grande's] business and funds." ECF No. 2-2 at 4; ECF No. 2-5 at 4.

---

[8] After Lieberman proposed an alternate *beth din* forum, the second summons from Respondents added an additional claim against Lieberman, a claim for copyright infringement stemming from alleged misuse of Congregation Casa Grande's logo. ECF No. 2-5 at 8. But that claim, too, arises from the same factual nexus and thus concerns the same dispute between the parties. ECF No. 2-3 at 2-3, 14-16.

Respondents' complaint in the Arizona Lawsuit also treats Breier and Lieberman as a single unit, alleging that they co-founded Congregation Khal Chasidim and partnered in a scheme to "confuse donors and defraud [Respondents]." ECF No. 2-3 at 7. Having already asserted that Petitioners "acted in concert," Respondents "cannot now escape the consequences of those allegations" to avoid arbitration. Denney, 412 F.3d at 70 (citing allegations in plaintiff's original complaint as evidence that plaintiff treated the defendants as a single unit for the purposes of compelling arbitration based on equitable estoppel); see also Smith/Enron Cogeneration P'Ship, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 98 (2d Cir. 1999) ("[B]y treating the Enron entities as a single unit in its complaint in [a different lawsuit], SCI is estopped from claiming that the current signatories to the [arbitration agreement] are distinct from [those] defendants[.]"). In sum, the relationship between the parties is sufficient to allow Lieberman to compel Respondents to arbitrate.

For the same reasons, Congregation Khal Chasidim may compel Respondents to arbitrate. Here, too, Respondents make the same allegations against Congregation Khal Chasidim as they do against Breier and Lieberman. The dispute Respondents raise in the Arizona Lawsuit involving Congregation Khal Chasidim is the same dispute that Respondents sought to arbitrate with Lieberman and Breier, as is evident from the summonses issued to both. ECF No. 2-2 at 4; ECF No. 2-3 at 2–3; ECF No. 2-5 at 4. The issues Congregation Khal Chasidim seeks to resolve through arbitration are thus sufficiently intertwined with the agreement between Rubin and Breier. See Salzano, 2014 WL 3583195, at *5; Cooper, 990 F.3d at 189 (Sullivan, J., dissenting); Awad, 2025 WL 753865, at *8; In re A2P, 972 F. Supp. 2d at 478. Additionally, Congregation Khal Chasidim also has a sufficiently close relationship with the parties to compel arbitration. In that respect, Respondents have treated Congregation Khal Chasidim, Lieberman, and Breier as a

single unit. For example, in Respondents' Arizona Lawsuit, Respondents allege that "Breier, Lieberman, and [Congregation] Khal [Chasidim] conspired together to engage in [a] scheme and confuse donors," and "worked hand-in-hand." ECF No. 2-3 at 29, 32-33. For the same reasons discussed with respect to Lieberman, Respondents cannot avoid the consequences of their allegations and shield themselves from arbitration with Congregation Khal Chasidim. See Denney, 412 F.3d at 70; Smith/Enron, 198 F.3d at 98.

## CONCLUSION

For the foregoing reasons, Petitioners' motion to compel arbitration is **GRANTED**. The Clerk of Court is respectfully directed to close the motion at ECF No. 2.

**SO ORDERED.**

DATED: New York, New York
September 22, 2026

VALERIE FIGUEREDO
United States Magistrate Judge